# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DENISE NEMETH-GREENLEAF, *et al.*,<br><br>           Plaintiffs,<br><br>     v.<br><br>UNITED STATES OFFICE OF<br>PERSONNEL MANAGEMENT, *et al.*,<br><br>           Defendants. | Case No. 1:25-cv-00407-CRC<br><br>Judge Christopher R. Cooper |

### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendants—the U.S. Office of Personnel Management ("OPM"), and the U.S. Department of the Treasury ("Treasury") move the Court to dismiss this action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

Dated:  August 4, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Pierce J. Anon*
PIERCE J. ANON
(N.Y. Bar No. 6184303)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DENISE NEMETH-GREENLEAF, *et al.*,

       Plaintiffs,

   v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, *et al.*,

       Defendants.

Case No. 1:25-cv-00407-CRC

Judge Christopher R. Cooper

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      The Privacy Act ..................................................................................................... 2

II.     The United States DOGE Service And Related Executive Orders ....................... 3

III.    Plaintiffs' Claims ................................................................................................... 4

STANDARD OF REVIEW ................................................................................................ 6

I.      Rule 12(b)(1) ......................................................................................................... 6

II.     Rule 12(b)(6) ......................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.      Plaintiffs Lack Standing ........................................................................................ 7

        A.      Plaintiffs Fail To Allege A Cognizable Injury-In-Fact ............................. 8

                1.      Plaintiffs' Alleged Injuries Are Not Concrete Harms ................... 8

                        a.  Plaintiffs Have Not Suffered An Injury In The Common Law ................ 8

                        b.  Plaintiffs Have Not Suffered Actual Harm ............................. 11

                2.      Plaintiffs' Alleged Harms Are Speculative And Not Actual Or
                        Imminent ....................................................................................... 14

                3.      Plaintiffs' Alleged Harms are Not Traceable to the Defendant
                        Agencies ....................................................................................... 17

                4.      Plaintiffs Cannot Establish Standing Based On Alleged Harms To
                        Their Family Members ................................................................. 20

II.     Plaintiffs' Privacy Act Claim Should Be Dismissed .......................................... 21

        A.      Plaintiffs Have Not Adequately Alleged Any "Actual Damages" ......... 21

                1.      Purchasing Identity Theft Protect Does Not Constitute "Pecuniary
                        Harm" ........................................................................................... 23

                2.      Isolated Instances Of Unauthorized Credit And Debit Card Use Does

i

Not Constitute "Pecuniary Harm" ................................................................. 27

B.      Plaintiffs Are Not Entitled To The Other Forms Of Relief They Seek ............... 29

III.    Plaintiffs' FISMA Claims Should Be Dismissed ..................................................... 30

IV.     The Court Should Resolve The Threshold Questions Of Standing And Failure To
        State A Claim Before This Matter Proceeds Any Further ................................................. 31

CONCLUSION ........................................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases***,*

*All. for Retired Ams. v. Bessent,*
    --- F. Supp. 3d ---, 2025 WL 740401 (D.D.C. Mar. 7, 2025) .................................................... 9

*Allison v. Aetna, Inc.,*
    No. 09-2560, 2010 WL 3719243 (E.D. Pa. Mar. 9, 2010) ...................................................... 15

*Al-Zahrani v. Rodriguez,*
    669 F.3d 315 (D.C. Cir. 2012) ................................................................................................ 6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
    771 F. Supp. 3d 717 (D. Md. 2025) ...................................................................................... 16

*Amburgy v. Express Scripts, Inc.,*
    671 F. Supp. 2d 1046 (E.D. Mo. 2009) ................................................................................. 15

*Am. Fed'n of & Congress of Indus. Orgs. v. Dep't of Lab.,*
    --- F. Supp. 3d ---, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) .................................... 9, 30, 31

*Am. Fed'n of Tchs. v. Bessent,*
    No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025) .............................................. 9, 10, 12

*Antman v. Uber Techs., Inc.,*
    No. 15-01175, 2015 WL 6123054 (N.D. Cal. Oct. 19, 2015) ................................................ 17

*Arabzada v. Donis,*
    725 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................................ 7

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ............................................................................................... 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................................ 6, 7

*Attias v. Carefirst, Inc.,*
    865 F.3d 620 (D.C. Cir. 2017) ............................................................................................. 24

*Barclift v. Keystone Cred. Servs., LLC,*
    585 F. Supp. 3d 748 (E.D. Pa. 2022) .................................................................................... 12

*Barclift v. Keystone Cred. Servs., LLC,*
    93 F.4th 136 (3d Cir. 2024) .................................................................................................. 12

*Beck v. McDonald*,
   848 F.3d 262 (4th Cir. 2017) ................................................................ 12, 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................. 6

*Bozgoz v. James*,
   No. 19-0239 (ABJ), 2020 WL 4732085 (D.D.C. Aug. 14, 2020) ......................... 22

*Browning v. Clinton*,
   292 F.3d 235 (D.C. Cir. 2002) ................................................................ 6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................... *passim*

*Conley v. Gibson*,
   355 U.S. 41 (1957) ............................................................................. 6

*Daimler Chrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ............................................................................ 6

*De Medicis v. Ally Bank*,
   No. 24-6799, 2022 WL 3043669 (S.D.N.Y. Aug. 2, 2022) .............................. 19

*Dickson v. Direct Energy, LP*,
   69 F.4th 338 (6th Cir. 2023) ................................................................ 10

*Doe v. Chao*,
   435 F.3d 492 (4th Cir. 2006) ................................................................ 30

*Doe v. Chao*,
   540 U.S. 614 (2004) ...................................................................... 26, 29

*Doe v. OPM*,
   No. 25-cv-234, 2025 WL 513268 (D.D.C. Feb. 17, 2025) .............................. 8, 15

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988) ............................................................. 30

*Edward M. Crough, Inc. v. Dep't of Gen. Servs. of D.C.*,
   572 A.2d 457 (D.C. 1990) ................................................................... 29

*FAA v. Cooper*,
   566 U.S. 284 (2012) ..................................................................... *passim*

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ..................................................................... 14, 20

*Fernandez v. Leidos,*
    127 F. Supp. 3d 1078 (E.D. Cal. 2015) ................................................................ 18

*Fernandez v. Zoni Language Ctrs., Inc.,*
    No. 15-cv-6066, 2016 WL 2903274 (S.D.N.Y. May 18, 2016) ............................... 28

*Fischer v. District of Columbia,*
    No. 24-CV-00044 (CRC), 2025 WL 894445 (D.D.C. Mar. 24, 2025*)* ..................... 32

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .......................................................................... 7, 25

*Fus v. CafePress, Inc.,*
    No. 19-06601, 2020 WL 7027653 (N.D. Ill. Nov. 30, 2020) ................................. 19

*Gadelhak v. AT&T Services, Inc.,*
    950 F.3d 458 (7th Cir. 2020) .............................................................................. 10

*Garey v. James S. Farrin, P.C.,*
    35 F.4th 917 (4th Cir. 2022) ............................................................................. 9, 30

*Galaria v. Nationwide Mut. Ins. Co.,*
    663 F. App'x 384 (6th Cir. 2016) ........................................................................ 20

*Glass v. U.S. Dep't of Just.,*
    279 F. Supp. 3d 279(D.D.C. 2017) ...................................................................... 24

*Gordon v. Zeroed-In Tech., LLC,*
    No. CV 23-3284-BAH, 2025 WL 936415 (D. Md. Mar. 26, 2025) .......................... 17

*Greentree v. U.S. Customs Serv.,*
    674 F.2d 74 (D.C. Cir. 1982) ............................................................................... 2

*Hammond v. Bank of N.Y. Mellon Corp.,*
    No. 08-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) .................................. 15

*Hecate Energy LLC v. FERC,*
    126 F.4th 660 (D.C. Cir. 2025) ........................................................................... 7

*Howard v. Gutierrez,*
    474 F.2d 41 (D.D.C. 2007) ................................................................................. 32

*Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.,*
    48 F.4th 1236 (11th Cir. 2022) ........................................................................... 11

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.,*
    892 F.3d 613 (4th Cir. 2018) .............................................................................. 17

v

*In re OPM Data Sec. Breach Litig.*,
266 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................ 30

*In re OPM Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) ....................................................................... *passim*

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014) ................................................................. *passim*

*In re Uber Techs., Inc., Data Sec. Breach Litig.*,
No. 18-2970, 2019 WL 6522843 (C.D. Cal. Aug. 19, 2019) ................................ 17

*In re Vtech Data Breach*,
No. 150-10889, 2017 WL 2880102 (N.D. Ill. July 5, 2017) ................................. 19

*Indus. Energy Consumers of Am. v. FERC*,
125 F.4th 1156 (D.C. Cir. 2025) ........................................................................ 14

*Jenkins v. Howard Univ.*,
123 F.4th 1343 (D.C. Cir. 2024) .......................................................................... 6

*Kang v. Dep't of Homeland Sec.*,
No. CV 21-2944 (RJL), 2022 WL 4446385 (D.D.C. Sept. 23, 2022) ..................... 32

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
No. 23-CV-3570 (CRC), 2024 WL 4239936 (D.D.C. Sept. 19, 2024) ................... 25

*Kim v. McDonald's USA, LLC*,
No. 21-CV-05287, 2022 WL 4482826 (N.D. Ill. Sept. 27, 2022) .......................... 19

*Kylie S. v. Pearson PLC*,
475 F. Supp. 3d 841, 848 (N.D. Ill. 2020) .......................................................... 19

*Laird v. Tatum*,
408 U.S. 5 (1972) ............................................................................................. 14

*Leopold v. Manger*,
630 F. Supp. 3d 71 (D.D.C. 2022) ....................................................................... 6

*Liberty Mut. Ins. Co. v. Consol. Elec. & Tech. Assocs. Corp.*,
No. CIVA 06-CV-10217 DT, 2007 WL 118938 (E.D. Mich. Jan. 10, 2007) .......... 28

*Londrigan v. FBI*,
670 F.2d 1164 (D.C. Cir. 1981) ........................................................................... 2

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 7, 17

vi

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) ......................................................................... 10

*Luster v. Vilsack*,
  667 F.3d 1089 (10th Cir. 2011) ....................................................................... 26

*Mandel v. U.S. Off. of Pers. Mgmt.*,
  244 F. Supp. 2d 146 (E.D.N.Y. 2003) .............................................................. 26

*McGowan v. CORE Cashless, LLC*,
  No. 2:23-CV-524, 2023 WL 8600561 (W.D. Pa. Oct. 17, 2023) ..................... 16

*Micei Int'l v. Dep't of Com.*,
  613 F.3d 1147 (D.C. Cir. 2010) ......................................................................... 6

*Mulhern v. Gates*,
  525 F. Supp. 2d 174 (D.D.C. 2007) .................................................................. 26

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................ 14

*N. Am. Butterfly Ass'n v. Wolf*,
  977 F.3d 1244 (D.C. Cir. 2020) .......................................................................... 7

*N. Va. Hemp & Agric., LLC v. Virginia*,
  125 F.4th 472 (4th Cir. 2025) ........................................................................... 20

*O'Leary v. TrustedID, Inc.*,
  60 F.4th 240 (4th Cir. 2023) ............................................................................... 9

*Philippeaux v. United States*,
  No. 10 CIV. 6143 NRB, 2011 WL 4472064 (S.D.N.Y. Sept. 27, 2011) ............ 26

*Postal Police Officers Ass'n v. U.S. Postal Serv.*,
  719 F.3d 56 (D.D.C. 2024) ................................................................................. 7

*Randolph v. ING Life Insurance & Annuity Co.*,
  486 F. Supp. 2d 1 (D.D.C. 2007) ................................................................ 13, 15

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011) .......................................................................... 12, 26

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................................... 21

*Six v. IQ Data Int'l, Inc.*,
  129 F.4th 630 (9th Cir. 2025) ........................................................................... 10

*Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
    145 S. Ct. 1626 (2025) .................................................................................. 2, 9

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .......................................................................................... 8

*Stewart v. Kendall*,
    578 F. Supp. 3d 18 (D.D.C. 2022) ............................................................ 22, 23, 24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................ 20

*Sussman v. U.S. Marshal Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ....................................................................... 30

*Taylor v. Fed. Aviation Admin.*,
    351 F. Supp. 3d 97 (D.D.C. 2018) ................................................................... 11

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................. *passim*

*Trump v. Boyle*,
    No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ........................................... 2

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................................... 7, 11

*Welborn v. Internal Revenue Serv.*,
    218 F. Supp. 3d 64 (D.D.C. 2016) ............................................................. *passim*

*Whitaker v. Health Net of Cal., Inc.*,
    No. 11-910, 2012 WL 174961 (E.D. Cal. Jan. 20, 2012) ..................................... 15

*Wrocklage v. DHS*,
    769 F.3d 1363 (Fed. Cir. 2014) ....................................................................... 26

**Statutes**

5 U.S.C. § 552 ......................................................................................................... 23

5 U.S.C. § 552a ......................................................................................................... 2

5 U.S.C. § 552a(a)(4) ............................................................................................. 2, 3

5 U.S.C. § 552a(g)(1) ............................................................................................... 22

5 U.S.C. § 552a(g)(1)(A) .......................................................................................... 21

5 U.S.C. § 552a(g)(1)(B) ................................................................................................. 21

5 U.S.C. § 552a(g)(1)(D) ............................................................................................. 3, 30

5 U.S.C. § 552a(g)(2)(A) ................................................................................................. 29

5 U.S.C. § 552a(g)(4)(A) ................................................................................................. 22

5 U.S.C. § 3161 ............................................................................................................. 3, 4

44 U.S.C. § 3554(a)(1)(A) ............................................................................................... 31

Fair Credit Billing Act, 15 U.S.C. § 1601 *et seq* ........................................................... 29

**Rules**

Fed. R. Civ. P. 23(c)(1)(A) ............................................................................................... 34

**Regulations**

5 C.F.R. § 297.102 .......................................................................................................... 27

*OMB Guidelines*, 40 Fed. Reg. 28948 (July 9, 1975) ................................................... 21

Executive Order 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ....................................... 3, 4

**Other Authorities**

Comm'n on Fed. Paperwork,
  *Privacy and Confidentiality: Issues in Information Sharing* (1977) ............................ 2

GAO Letter, GAO-24-107323, *Priority Open Recommendations: Office of Personnel Management*
  (May 28, 2024), https://perma.cc/TQA8-M2NS ........................................................ 4

GAO Report, GAO-23-104786, Financial Statement Audit: Bureau of the Fiscal Service's FY22
  Schedules of the General Fund (March 30, 2023), https://perma.cc/JJ6R-S2BG ..................... 4

Joanne Gasparini, Get All Your Federal Benefit Payments in One Account Using Direct
  Payment, Social Sec. Admin. (Sept. 3, 2020), http://perma.cc/UHR5-JZVX ......................... 27

Mark Kapczynski, What can someone do with your account and routing number?, OneRep
  (June 12, 2025), https://perma.cc/3BLQ-6NFT ......................................................... 27

Sheryl Nance-Nash, *If Someone Has Your Bank Account Number Can They Take Money Out?*,
  SoFi (May 19, 2025), https://perma.cc/V4AR-M37G ................................................... 28

William Rubenstein *et al.*, Newberg on Class Actions (5th ed. 2020) ............................ 32

## INTRODUCTION

In this case, Plaintiffs allege that the U.S. Office of Personnel Management ("OPM") and the U.S. Department of the Treasury ("Treasury") have impermissibly allowed employees, detailees, and affiliates of the U.S. Department of Government Efficiency Service ("USDS" or "DOGE"), to access their personal security information ("PSI") in violation of the Privacy Act of 1974. Plaintiffs claim not only that these individuals were not Government employees but also that there was no lawful or legitimate need for such information. Plaintiffs characterize this alleged disclosure of information as akin to giving "hackers" access to their information. First Am. Class Action Compl. ("Am. Compl.") ¶ 4, ECF No. 19. Plaintiffs seek actual and statutory damages, along with prejudgment interest and associated litigation costs.

Plaintiffs' claims are sensational, conclusory, and threadbare. Plaintiffs lack standing because they do not sufficiently allege any cognizable Article III injury. For one thing, a statutory violation, *i.e.*, unauthorized access to Plaintiffs' information, does not by itself create standing. Plaintiffs have alleged no public disclosure of any information accessed by DOGE-affiliated personnel, nor have they claimed concrete, non-speculative, particularized harm resulting from the alleged unauthorized access. Plaintiffs also fail to state a claim for which relief can be granted. Plaintiffs' alleged harms are not cognizable under the Privacy Act. In short, the Privacy Act requires that Plaintiffs plead pecuniary harm. Apart from the alleged pecuniary harm from purchasing identity theft mitigation services, and the two isolated instances of unauthorized credit and debit card charges, Plaintiffs fail to do so. In any event, their attempt to create pecuniary harm by buying identity theft prevention services also fails because there is no substantial risk of future harm under the facts of the complaint to justify that expenditure. Plaintiffs' alleged pecuniary harm from the unauthorized credit and debit card charges fare no better. Not only are the charges not credibly traceable to any of Defendants' actions, but a nefarious actor could not create unauthorized charges with the information Defendant agencies possessed alone. Nor do Plaintiffs aver that they actually incurred such charges as their credit and debit card policies offer fraud

1

protection services.

What is more, the Supreme Court recently granted the government's application for a stay of a district court's preliminary injunction order in another case challenging USDS's access to agency records systems under the Privacy Act. *Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025). Although this order was not based on the merits, it strongly militates towards finding in favor of the Defendants here as the claims and facts in the stayed case are highly analogous, if not functionally indistinguishable. "Although [the Supreme Court's] interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *See Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025).

Accordingly, Plaintiffs' Amended Complaint should be dismissed.

## BACKGROUND

### I.      The Privacy Act

The Privacy Act of 1974, 5 U.S.C. § 552a, "was designed to provide individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves." *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982). The Act was Congress's response to "a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies that the citizen would never know of, let alone have an opportunity to rebut or correct." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981).

The Privacy Act creates procedures "to give the individual some control over the ways in which Federal executive agencies handle[] . . . personal information at every stage of the information process." Comm'n on Fed. Paperwork, *Privacy and Confidentiality: Issues in Information Sharing* 21 (1977). To that end, the Act imposes burdens on federal agencies and creates rights for individuals when agencies collect, maintain, use, and disseminate "records." The

Act defines "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency[.]"  5 U.S.C. § 552a(a)(4).

If an agency maintains the records it collects such that information can be retrieved "by the name of [an] individual or by some identifying number, symbol, or other identifying particular"— a "system of records"—additional responsibilities obtain.  *Id.* § 552a(a)(5).  Among other things, an agency may not disclose records contained in a system of records except with the consent of the individual to whom the record pertains, or pursuant to one of twelve exceptions.  *Id*. § 552a(b).  One of those exceptions allows disclosure of covered records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties[.]"  *Id*. § 552a(b)(1).

That prohibition is made enforceable through a catch-all remedial provision applicable when the agency "fails to comply with any other provision of this section"—that is, any provision other than those relating to accessing and correcting records.  *Id.* § 552a(g)(1)(D).  If the agency's failure has "an adverse effect on an individual," the affected person may bring a civil suit in federal district court.  *Id.*  And if that failure "was intentional or willful," the plaintiff may obtain attorney's fees and the greater of the plaintiff's actual damages or $1,000.  *Id.* § 552a(g)(4).

## II.    The United States DOGE Service And Related Executive Orders

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established U.S. Digital Service designed to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems."  90 Fed. Reg. 8441, § 4 ("USDS EO").  The USDS EO also redesignated the U.S. Digital Service as the U.S. Department of Government Efficiency Service, or U.S. DOGE Service.  *Id.* § 3(a).  It established a "U.S. DOGE Service Temporary Organization" in the Executive Office of the President under 5 U.S.C. § 3161, which will terminate on July 4, 2026.  *Id.* § 3(b).  The USDS EO requires agency heads to establish in their respective agencies a USDS team of at least four agency employees.  *Id.* § 3(c).

The USDS EO directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government, to increase efficiency and productivity, as well as ensure data integrity. *Id.* § 4. Regarding Treasury, the need to modernize and ensure data integrity is uniquely critical: the Government Accountability Office ("GAO") has identified "problems in accounting for transactions between federal agencies," resulting in potentially improper payments totaling approximately $2.7 trillion dollars. *See* GAO, GAO-23-104786, *Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General Fund* (March 30, 2023), https://perma.cc/JJ6R-S2BG. And as to OPM, GAO has identified 16 "priority recommendations" involving "preventing improper payments," "improving payroll data," and "strengthening IT security and management." *See* GAO Letter, GAO-24-107323, *Priority Open Recommendations: Office of Personnel Management* 1-2 (May 28, 2024), https://perma.cc/TQA8-M2NS (capitalization and bold removed). GAO stated that "[f]ully implementing these open recommendations could significantly improve both OPM's operations and its efforts to assist federal agencies in addressing various human capital management issues." *Id*. at 1.

To accomplish its objectives, the USDS EO directs USDS to work with relevant agency heads, and vice versa, to ensure USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law[.]" USDS EO § 4(b). At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

### III.    Plaintiffs' Claims

Plaintiffs—five individuals employed by the federal Government—filed suit on February 11, 2025, claiming that Defendants OPM and Treasury have engaged in an unlawful and ongoing disclosure of their personal information in violation of the Privacy Act. Am. Compl. ¶ 2. Such information allegedly includes their full names, addresses, social security number, driver's license, passport number, personal health information, medical records, and financial account information ("Personal Sensitive Information" or "PSI"). *Id.* Plaintiffs claim that they were made aware of

the supposed breaches of their PSI from "media reports[,]" and in response, they claim to have purchased varying forms of identity theft protection.  *Id.* ¶¶ 14-16.

Plaintiffs allege that both OPM and Treasury permitted unlawful access to persons not employed by the government.  They aver that OPM impermissibly disclosed sensitive information through its Enterprise Human Resources Integration ("EHRI") program that manages access to the electronic Official Personnel Folder ("eOPF") for federal employees, *id.* ¶¶ 21-24, 26, and that Treasury disclosed PSI as its Bureau of the Fiscal Service ("BFS") collects and maintains a wide variety of sensitive information in its handling of federal employees' salaries, *id.* ¶¶ 13, 20. Plaintiffs allege that the Secretary of the Treasury, Scott Bessent, personally and improperly granted DOGE-affiliated individuals full access to the BFS data and the computer systems that house such data, which includes Plaintiffs' PSI.  *Id.* ¶ 29.  Plaintiffs claim that DOGE team members within agencies that were given access to PSI located at Treasury and OPM had not obtained security clearances, taken the required annual Cyber Security and Privacy Awareness training, and did not access the information for a legitimate purpose.  *Id.* ¶¶ 29, 32.  They further claim that Elon Musk was not a federal government employee at the time of the alleged breach. *Id.* ¶ 27.

The Amended Complaint goes on to enumerate Plaintiffs' purported harms.  Plaintiffs assert that they were harmed because they "have no assurance that their PSI will receive the protection that federal law affords" and that permitting this kind of access puts Plaintiffs at risk, making them "vulnerable to fraud, cyber-attack, and actual theft."  *Id.* ¶¶ 78-79.  And that as a result, Plaintiffs will continue to suffer damages, "including actual damages within the meaning of the Privacy Act, pecuniary losses, anxiety, and emotional distress."  *Id.* ¶ 87.  More specifically, Plaintiffs allege that they have suffered, "or are at risk of suffering from:" (1) the inability to determine how their PSI is used; (2) the "compromise, publication, and/or theft" of their PSI and that of their family members; (3) out of pocket costs associated with prevention of possible PSI theft; (4) "lost opportunity costs associated with effort expended" from addressing any

consequences from possible breaches; (5) continued risk to their PSI; (6) and the current and future costs "in terms of time, effort, and money that will be expended to monitor, prevent, detect, contest, and repair the impact of the compromised PSI data." *Id.*

Plaintiffs request actual and statutory damages, as well as associated litigation costs. *Id.* at Prayer for Relief. Plaintiffs also seek to certify a proposed class of current, former, and prospective government employees who allegedly had their PSI accessed without their prior written authorization from OPM and Treasury beginning in January 2025. *Id.* ¶¶ 88-100.

## STANDARD OF REVIEW

### I.    Rule 12(b)(1)

Federal courts are courts of "limited subject-matter jurisdiction" and have the power "to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)). "Absent subject-matter jurisdiction over a case, the court must dismiss it." *Leopold v. Manger*, 630 F. Supp. 3d 71, 76 (D.D.C. 2022), *aff'd on other grounds*, 102 F.4th 491 (2024). To survive a Rule 12(b)(1) motion, the party asserting subject matter jurisdiction—here Plaintiffs— bear "the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)).

### II.   Rule 12(b)(6)

Defendants also move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for Plaintiffs' failure to state a claim upon which relief can be granted. The standard under Rule 12(b)(6) is a familiar one, in which a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, Rule 12(b)(6) "tests the legal sufficiency" of a plaintiff's claims, and dismissal is warranted where a plaintiff can prove "'no set of facts in support of his claim which would entitle him to relief.'" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting *Conley v. Gibson*, 355 U.S. 41,

45-46 (1957)).   In supporting their claims, plaintiffs must go beyond "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" as such barebones pleadings "do not suffice."   *Ashcroft*, 556 U.S. at 678.

Movants—here Defendants—bear the burden of establishing that a Rule 12(b)(6) dismissal is appropriate.   *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 719 F. Supp. 3d 56, 61 (D.D.C. 2024).   In reviewing a motion to dismiss, the Court takes "the operative complaint's well- pleaded factual allegations as true and draw[s] all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).   At the same time, however, courts "need not accept inferences drawn by a plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept a plaintiff's legal conclusions."   *Arabzada v. Donis*, 725 F. Supp. 3d 1, 9 (D.D.C. 2024) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

## ARGUMENT

### I.    Plaintiffs Lack Standing

Standing is a central component of Article III's case-or-controversy requirement and demands that plaintiffs have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction."   *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted).   At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision.   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).   The party invoking federal court jurisdiction "bears the burden of establishing each of those elements."   *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025).

A.    **Plaintiffs Fail To Allege A Cognizable Injury-In-Fact**

1.    **Plaintiffs' Alleged Injuries Are Not Concrete Harms**

An injury-in-fact must have a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts[.]"    *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-341 (2016)).    While Congress "may elevate harms that exist in the real world before Congress recognized them to actionable legal status," at the same time, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is."    *Id.* at 426 (citations and quotations omitted).    Congress may create "a statutory prohibition or obligation and a cause of action," but it may not override Article III's injury requirement.    *Id.*; *see also Doe v. OPM*, No. 25-cv- 234, 2025 WL 513268, at *5 (D.D.C. Feb. 17, 2025) ("[N]ot every statutory violation results in the type of concrete injury-in-fact sufficient to support Article III standing."). The need for an independent Article III injury is particularly important when considering intangible forms of injury, like the ones Plaintiffs assert in this case.

Plaintiffs proceed under varying theories of injury-in-fact.    The common thread of their theory of harm that Plaintiffs, as current and former Government employees, provided various forms of information to Treasury and OPM, and that Defendants' actions in allowing certain members of the Government to access agency records compromises or could compromise an expectation of privacy in a way that injures them.    But Plaintiffs fail to allege any public disclosure of any information accessed by DOGE-affiliated personnel, let alone any public disclosure of Plaintiffs' information beyond speculative and conclusory claims.    That is a crucial distinction for purposes of Article III standing.

a.    **Plaintiffs Have Not Suffered An Injury In The Common Law**

As an initial matter, Plaintiffs have not alleged any analogous harm in the common law or a harm traditionally recognized by courts.    At most Plaintiffs claim "privacy rights afforded to federal employees as well as . . . American citizens in general" and that there has been a "unlawful

8

and flagrant intrusion into federal employees' privacy." Am. Compl. ¶¶ 4, 76. But this vague assertion made in passing does not illustrate any traditionally recognized harm. Plaintiffs' failure to plead such an analog is fatal to their standing—"plaintiffs proceeding under a statutory cause of action can establish a cognizable injury by 'identif[ying] a close historical or common-law analogue for their asserted injury' for which courts have 'traditionally' provided a remedy." *Garey v. James S. Farrin, P.C.,* 35 F.4th 917, 921 (4th Cir. 2022) (alteration in the original) (quoting *TransUnion*, 594 U.S. at 424); *see also O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 245 (4th Cir. 2023) (since plaintiff has not pleaded a nonspeculative connection "between the alleged statutory violation and identity theft," plaintiff's reliance on some abstract privacy interest in his SSN itself "bears no close relationship to a traditional or common-law analog.").

To be sure, even if they had identified some common law analog, such a proxy for harm would still be insufficient as applied here. First, the tort of intrusion upon seclusion is a poor fit for challenges to agency access-to-data decisions, as a majority of a three-judge panel of the Fourth Circuit recently concluded in granting the government's motion to stay a preliminary injunction against Treasury and other agencies in *American Federation of Teachers v. Bessent* ("*AFT*"), another challenge to DOGE affiliates' access to agency record systems. *See* No. 25-1282, 2025 WL 1023638 (4th Cir. Apr. 7, 2025).[12] As Judge Agee explained in his concurring opinion, joined by Judge Richardson, "[a]t its core, the harm contemplated by the common-law tort of intrusion

---

[1] At the request of Judge King, the full Fourth Circuit considered the panel's decision for initial rehearing *en banc* and voted 8-7 to deny the request.

[2] Defendants acknowledge that two other courts in this District have concluded that the plaintiffs have standing to pursue their Privacy Act claims in similar (though not identical) circumstances. *See Am. Fed'n of Lab. & Congress of Indus. Orgs. v. Dep't of Lab.*, --- F. Supp. 3d ---, 2025 WL 1129227, at *8 (D.D.C. Apr. 16, 2025); *All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ---, 2025 WL 740401, at *14-17 (D.D.C. Mar. 7, 2025).[to the Supreme court's preliminary injunction in that case. *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty. & Mun. Emps.,* 145 S. Ct. 1626 (Mem.) (2025). The Supreme Court concluded that consideration of the relevant factors "warrants granting [a] stay," and that "SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work." *Id.*

9

upon seclusion includes an intrusion into an individual's private space." *Id.* at \*2.  And as Judge Agee correctly noted, other circuit decisions have "also concluded that the harm visited upon an individual by [the] intrusion upon seclusion must include some . . . interjection into the private sphere." *Id.*

Indeed, in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barrett, J.)— which the Supreme Court cited in *TransUnion*—the court addressed the receipt of unwanted text messages sent to the plaintiffs' personal cell phones—*i.e.*, actual intrusion into the peace and tranquility of the plaintiffs' use of their personal property.  *Gadelhak*, 950 F.3d at 462.  The same is true of *Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023), where the court found that "invasion-of-privacy-like harm[] flow[s] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere." *Id.* at 345-66.  In *Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021), the court also found standing based on unwanted telephone communications because they were an "unwanted intrusion into [the] plaintiff's peace and quiet." *Id.* at 1192.  And in *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630 (9th Cir. 2025), the court explained that other decisions have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion." *Id.* at 634.

In *American Federation of Teachers*, Judge Agee found that alleged accessing of personal information in government record systems by DOGE team members within agencies does not allege "any interjection into the private sphere analogous to . . . unsolicited mailings . . . or unsolicited phone calls" and accordingly rejected analogizing such access to the common law tort of intrusion upon seclusion.  *AFT*, 2025 WL 1023638, at \*2; *see also id.* at \*4–5 (Judge Richardson's concurring opinion) (agreeing that plaintiffs lacked standing and rejecting analogy to intrusion upon seclusion).  Just so here.  Plaintiffs have failed to assert, or plausible allege, that access to information by DOGE team members within Treasury and OPM rises to a harm recognized at common law or one traditionally acknowledged by the courts.

### b. Plaintiffs Have Not Suffered Actual Harm

Plaintiffs' remaining claims to concrete harm also fail. Plaintiffs allege that "Defendants' actions resulted in . . . the disclosure of Plaintiffs' and Class Members' records without prior written consent" in violation of the Privacy Act. Am. Compl. ¶ 113. Defendants dispute Plaintiffs' claims that there was any impermissible disclosure. But even assuming—solely for purposes of the injury-in-fact analysis, *see, e.g.*, *Warth*, 422 U.S. at 502—that there had been such a disclosure, unauthorized disclosure alone would not give rise to an actual concrete harm. The Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), leaves no doubt that a statutory violation is not, by itself, a cognizable Article III injury. *Id.* at 426-27.

Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court." *Id.* at 427 (emphasis in original). For Plaintiffs to establish some concrete harm, they would need to show not just *access* to their information, but that the information had been disclosed in a way that causes them harm, such as a public disclosure. *See id.* at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation." (citation omitted)); *see also Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97, 104 (D.D.C. 2018) ("Thus, the wrongful possession of Plaintiff's personal information, without more, does not establish an injury in fact."); *see also Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from the disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public.). In *TransUnion*, individuals who had a credit report that classified them as terrorists disseminated to third-party businesses were deemed to have Article III standing because they "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." 594 U.S. at 432-33. Another example would be a data breach that caused real harm. *Compare In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 55-58 (D.C. Cir. 2019) (per curiam) (finding that "hackers" accessed confidential information as part of

a cyberattack and plaintiffs indicated subsequent misuse of that information), *with Reilly v. Ceridian Corp.*, 664 F.3d 38, 44 (3d Cir. 2011) (finding that plaintiffs "alleged no misuse, and therefore, no injury" because all that is known was that a firewall was penetrated.), *and Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) (same).

At bottom, Plaintiffs have alleged no public disclosure of any information accessed by DOGE-affiliated personnel—much less that Plaintiffs' specific and unique personal information has been viewed out of the "approximately 2 million federal employees" or that any actual, concrete harm resulted as a consequence.  Am. Compl. ¶ 21.  Plaintiffs' far-fetched assumption that DOGE had accessed their individual PSI would be akin to finding a needle in a haystack.  *See AFT*, 2025 WL 1023638, at *5 (Richardson, J., concurring) (questioning whether plaintiffs' information stored in government databases could be a part of intrusion upon seclusion at all because their information "is one row in various databases that are millions upon millions of rows long."); *see also In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 29 (D.D.C. 2014) (finding that "until Plaintiffs can aver that their records have been viewed (or certainly will be viewed) [by a nefarious third-party], any harm to their privacy remains speculative"); *Barclift v. Keystone Cred. Servs., LLC*, 585 F.3d 748, 758-59 (E.D. Pa. 2022) ("Even assuming that the employees of the mailing vendor read Barclift's personal information, sharing her personal information with 'a small group of persons is not publicity.'" (citation omitted)), *aff'd*, 93 F.4th 136 (3d Cir. 2024); *see also Barclift*, 93 F.4th at 146 ("Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones.").

Nor does the cost of preventing some form of conjectural future harm create standing. Plaintiffs allege pecuniary harm based on their alleged purchase of varying forms of identity theft prevention plans.  Am. Compl. ¶¶ 14-18, 87(c), 87(f).  Plaintiffs cannot manufacture standing by "inflicting harm on themselves" to defend against an otherwise speculative injury.  *SAIC*, 45 F.3d at 26; *see, e.g., Reilly*, 664 F.3d at 46 ("Appellants' alleged time and money expenditures to

monitor their financial information do not establish standing" because costs incurred to check on a "speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for Appellants' claims."); *Randolph v. ING Life Ins. & Annuity Co*., 486 F. Supp. 2d 1, 8 (D.D.C. 2007) (the "argument that the time and money spent monitoring a plaintiff's credit suffices to establish an injury overlook[s] the fact that their expenditure of time and money was not the result of any present injury, but rather the anticipation of future injury that has not materialized.") (internal quotation marks omitted). Here too, any feared harm is entirely speculative. There has been no public disclosure of Plaintiffs' personal information by the agency. The information they claim was disclosed is not plausibly traceable to the agency or any of its actions. Moreover, the alleged disclosed information does not place Plaintiffs at any credible or unique risk of further intrusion of their privacy." (cleaned up).

Consequently, Plaintiffs' costs of acquiring identity theft protection services for a harm that has not occurred and is not likely to occur because there has been no public disclosure, does not qualify as "actual damages" under *Cooper.* The same goes for Plaintiffs' other purported future harms. As to Plaintiffs' allegations of injury from the unauthorized charges to their credit and debit cards, as discussed *supra* Part II(A)(2), Plaintiffs failed to plead if they suffered any permanent financial loss. Indeed, their banks provide robust fraud protection coverage in the event of unauthorized transactions and it is quite possible no charges were ultimately incurred. *See Whalen v. Michaels Stores, Inc*., 689 F. App'x 89, 91 (2d Cir. 2017) (Finding no concrete injury suffered because plaintiff ultimately did not pay for the attempted fraudulent charges.) And, while Plaintiffs claim that the alleged breach has caused anxiety and emotional distress, Am. Compl. ¶ 87, "general anxiety does not establish standing." *Welborn v. Internal Revenue Serv*., 218 F. Supp. 3d 64, 77 (D.D.C. 2016).

### 2.  Plaintiffs' Alleged Harms Are Speculative And Not Actual Or Imminent

To establish Article III standing, Plaintiffs must show that they have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already

occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). For an injury to be imminent, it must be "certainly impending"; mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).  In other words, injury cannot be established through "a 'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment.'" *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 410).

Plaintiffs' complaint raises concerns about how those working for USDS might use information after they access it, but these allegations rely on precisely the "highly attenuated chain of possibilities," warned of in *Clapper*, 568 U.S. at 410, involving at least the following links: (1) Defendants give employees access to particular systems of records; (2) those employees actually access those systems; (3) the employees then find and access Plaintiffs' unique PSI to attain the sort of confidential information within those systems that give rise to Plaintiffs concerns; (4) the employees improperly use that information in a way that harms Plaintiffs, such as by leaking their PSI to the public or a criminal actor; and (5) Plaintiffs suffer pecuniary harm as a result of the use of the information.

Plaintiffs speculate that such a use of confidential information is possible because "[Elon] Musk's people could easily find individuals in databases or clone entire servers and transfer that secure information somewhere else" and that data "could be [Musk's] forever." Am. Compl. ¶ 37. But "the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose," is not enough for standing purposes.  *Laird v. Tatum*, 408 U.S. 5, 10-11 (1972); *see also Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (finding no standing where a theory of injury "rel[ies] on a speculative chain of possibilities"); *see also Welborn*, 218 F. Supp. 3d at 77 (finding no standing where the likelihood that plaintiff will suffer further harms remains

"entirely speculative and depends on the decisions and actions of one or more independent, and unidentified, actor(s).").

Plaintiffs also maintain that the alleged breach makes them "vulnerable to fraud, cyber-attack, and actual theft." Am. Compl. ¶ 79. This too misses the mark. Plaintiffs do not have standing based on risk alone. *See Clapper*, 568 U.S. at 414 (expressing "our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."); *Randolph*, 486 F.2d at 7-8 (finding that it was "mere speculation" to assume "that at some unspecified point in the indefinite future they w[ould] be the victims of identity theft."); *Whitaker v. Health Net of Cal., Inc.,* No. 11-910, 2012 WL 174961, at *2 (E.D. Cal. Jan. 20, 2012) ("[P]laintiffs do not explain how the loss here has actually harmed them . . . or that third parties have accessed their data.").

Any hypothesized harm stemming from USDS access to agency systems is precisely the type of conjectural and hypothetical harm that is insufficient to allege standing. *See, e.g.*, *Doe*, 2025 WL 513268, at *6 ("Plaintiffs must do more than point to a decade-old failure to protect sensitive data; they must show that OPM computer systems [accessed by new OPM employees] . . . are at imminent risk of cyberattack and that this risk would be mitigated were the agency required" to implement measures mandated by the Privacy Act); *Hammond v. Bank of N.Y. Mellon Corp.*, No. 08-6060, 2010 WL 2643307, at *7 (S.D.N.Y. June 25, 2010) ("Plaintiffs lack standing" where backup data tapes were stolen and most plaintiffs alleged only a risk of harm "because their claims are future-oriented, hypothetical, and conjectural."); *Allison v. Aetna, Inc.*, No. 09-2560, 2010 WL 3719243, at *5 (E.D. Pa. Mar. 9, 2010) ("Plaintiff's alleged injury of an increased risk of identity theft is far too speculative."); *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1052 (E.D. Mo. 2009) (no standing where "plaintiff does not claim that his personal information has in fact been stolen and/or his identity compromised" in the data breach).

A recent opinion analyzing similar allegations related to USDS access found that harms alleging "risk" of "identity theft," and a "risk" of "further dissemination of their data" are all

entirely conjectural.  *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 122 (D.D.C. 2025) (stating that plaintiffs provided no evidence, "beyond sheer speculation, that would allow the Court to infer that [] DOGE staffers will misuse or further disseminate this information."); *see also Am. Fed'n of State, Cnty. & Mun. Emps*., *AFL-CIO v. Soc. Sec. Admin*., 771 F. Supp. 3d 717, 770 (D. Md. 2025) (finding that plaintiffs' concerns of possible identity theft arising from the "unfettered access to [PSI] provided by SSA to the DOGE Team, is insufficient to establish standing."); *see also Beck*, 848 F.3d at 274-75 (4th Cir. 2017) (the "mere theft" of personal information, "without more, cannot confer Article III standing.").  So too here.  Plaintiffs do not possess standing because they fail to assert anything more than speculation, conjecture, and attenuated theories of harm.

Plaintiffs attempt to cure their deficient future-harm theory by amending their complaint to allege that an actual disclosure of their information—irrespective of traceability or concrete impact—somehow gives rise to a risk of further disclosure of their personal information.  But these reworked allegations are no less deficient than before.  Plaintiffs assert that the disclosure of some of their information either puts them at risk of future harm or that the disclosure itself constitutes a present harm.  Am. Compl. ¶ 5.  Plaintiffs claim that Defendants' actions "have already compromised Plaintiffs' and Class Members' PSI" and caused them harm because Plaintiffs Rifer and Nemeth-Greenleaf have had their "personal email address[es] disclosed on the dark web, along with a strong possibility that the linked password and other personal information might be compromised as well."  *Id*.  Beyond the conclusory and groundless claim that Plaintiffs' associated password and PSI *might also* have been compromised, allegations of harm in connection with the disclosure of Plaintiffs' personal emails on the dark web does not constitute harm in and of itself, nor could its disclosure place Plaintiffs at real risk of future harm.

Indeed, an armada of caselaw supports this commonsense conclusion—mere publication of an e-mail address on the dark web does not, by itself, confer Article III standing.  *See McGowan v. CORE Cashless, LLC*, No. 2:23-CV-524, 2023 WL 8600561 at *1, *11 (W.D. Pa. Oct. 17, 2023), *report and recommendation adopted*, No. 2:23-CV-00524-MJH, 2024 WL 488318 (W.D.

Pa. Feb. 8, 2024) (concluding that disclosure of "names, addresses, email addresses, phone numbers, and payment card information" was "not likely to subject Plaintiff to a substantial risk of identity theft or fraud"); *In re Uber Techs., Inc., Data Sec. Breach Litig.*, No. 18-2970, 2019 WL 6522843, at *4 (C.D. Cal. Aug. 19, 2019) ("Plaintiff fails to explain how gaining access to one's basic contact information and driver's license number creates a credible threat of fraud or identity theft."); *Antman v. Uber Techs., Inc.*, No. 15-01175, 2015 WL 6123054, at *11 (N.D. Cal. Oct. 19, 2015) ("Without a hack of information such as social security numbers, account numbers, or credit card numbers, there is no obvious, credible risk of identity theft that risks real, immediate injury."); *cf. Gordon v. Zeroed-In Tech., LLC*, No. CV 23-3284-BAH, 2025 WL 936415, at *9-10 (D. Md. Mar. 26, 2025) (describing an actual data breach and finding that the disclosure of plaintiffs' social security numbers *would be* enough to plausibly allege the actual misuse or imminent threat of misuse of their PSI).

Accordingly, Plaintiffs' alleged future harms are speculative rather than imminent, and therefore inadequate to support Article III standing.

### 3. Plaintiffs' Alleged Harms are Not Traceable to the Defendant Agencies

Even if Plaintiffs can show an imminent risk of identity theft, and they cannot, Article III standing further requires a "causal connection between the injury and the conduct complained of . . . ." *Lujan*, 504 U.S. at 560.  In other words, the injury must be fairly traceable "to the challenged action of the defendant," though it need not be "certainly traceable." *Id.*  In data breach cases, traceability generally requires "allegations demonstrating that it is both plausible and likely that a breach of the [ ] database resulted in the fraudulent use of the Plaintiffs' personal information." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018).  Putting aside that Plaintiffs have not plausible alleged any data breach, *see supra* Part I(A)(1)–(3), the Complaint lacks any allegations that any alleged harm is fairly traceable to any purported data breach involving Defendants.

17

In *SAIC*, the Court held that the plaintiffs' allegations of identity theft and fraud stemming from unauthorized credit card charges could not be causally linked to the breach because no plaintiff had alleged that credit card, debit card, or financial information was on the stolen tapes nor offered a plausible explanation for how a thief would have obtained this information in the data breach at issue. 45 F. Supp. 3d at 31. The Court also noted that it is implausible that a "identity-theft scheme is currently in progress or is certainly impending" because "roughly 3.3% of all Americans will experience identity theft of some form" so one would expect a similar percentage of customers to experience some type of identity theft "even if the tapes were never read or misused." *Id*. at 34. "If certain 'information [is] not on the [stolen] tapes . . . Plaintiff[ ] cannot causally link [the use of that information] to the [Data Breach].'" *Fernandez v. Leidos, Inc.*, 127 F. Supp. 3d 1078, 1086 (E.D. Cal. 2015) (citing *SAIC*, 45 F. Supp. 3d at 31).

Here, not only does Plaintiff Nemeth fail to allege that her credit card information was ever in the possession of Defendants, but both Plaintiffs Nemeth and Nemeth-Greenleaf fail to allege *any* public disclosure or data breach of their PSI beyond mere speculation of a series of "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410; *In re Samsung Data Sec. Breach Litig.*, 761 F. Supp. 3d 781, 801 (D.N.J. 2025) ("[T]here is no plausible explanation for how a thief obtained Plaintiffs' financial information without engaging in a series of hypotheticals, most of which would need to involve sophisticated social engineering to come to fruition.").

Plaintiffs' allegations cannot be credibly traced to any public data breach let alone any information Plaintiffs provided to Treasury and OPM. As discussed *supra* Part II(A)(2), the information a crook would have needed to gain access to their credit card is far more than what Plaintiffs allege was provided to Defendant agencies. Am. Compl. ¶¶ 84-85. *See SAIC*, 45 F. Supp. 3d at 31-32 (finding no causal link to the data breach when unauthorized charges were made to their credit or debit cards because "[n]o one alleges that their credit-card, debit-card, or bank-account information was on the stolen tapes"); *In re Samsung Data Sec. Breach Litig.*, 761 F. Supp. 3d at 795, 798 ("As for Plaintiffs' allegations of unauthorized charges . . . there is no

allegation that any of these Plaintiffs even provided the type of information needed to commit these types of identity theft, *i.e.*, financial account information or username or passwords" and that "it is not plausible, again, without engaging in speculation, that an actor could use the information obtained in this breach to make fraudulent charges or other identity theft."); *Kim v. McDonald's USA, LLC*, No. 21-CV-05287, 2022 WL 4482826, at \*5 (N.D. Ill. Sept. 27, 2022) (finding that Plaintiffs fail to plausible allege identity theft because "potential hackers would still need to resort to other methods to gain access to Plaintiffs' accounts."); *Clemens v. ExecuPharm Inc*., 48 F.4th 146, 154 (3d Cir. 2022) ("By contrast, the disclosure of financial information alone, without corresponding personal information, is insufficient" because "financial information alone generally cannot be used to commit identity theft or fraud").

Moreover, such relatively innocuous disclosures of PSI are commonplace and cannot be credibly traced to any breach at Treasury at OPM, which is perhaps why Plaintiffs do not directly advance that there has been any public breach of their PSI by the Defendant agencies.  Indeed, given the fast pace with which the world has started to digitize, there is a vast array of caselaw involving non-sensitive information, such as here, that have been repeatedly dismissed as a matter of course.  *See Kim*, 2022 WL 4482826, at \*5 (collecting cases); *see e.g.*, *Kylie S. v. Pearson PLC*, 475 F. Supp. 3d 841, 848 (N.D. Ill. 2020) ("In short, Plaintiffs' theory fails because the disclosed data [names, emails, and birthdays] is not sensitive enough to materially increase the risk of identity theft."); *De Medicis v. Ally Bank*, No. 24-6799, 2022 WL 3043669, at \*10 (S.D.N.Y. Aug. 2, 2022) (cleaned up) ("Instead, as alleged, Plaintiff's username and password appears to be less sensitive information that can be rendered useless to cybercriminals and does not pose the same risk of future identity theft or fraud to plaintiffs if exposed."); *Fus v. CafePress, Inc.*, No. 19-06601, 2020 WL 7027653, at \*3 (N.D. Ill. Nov. 30, 2020) ("[M]ost of Fus's information possessed by CafePress at the time of the hack was publicly available information, such as his billing and shipping address and personal email address. However, the disclosure of such information does not expose Fus to a significant risk of identity theft or fraud."); *In re Vtech Data Breach Litig.*,

19

No. 150-10889, 2017 WL 2880102, at *4 (N.D. Ill. July 5, 2017) ("Plaintiffs have not shown an increased risk of identity theft due to a data breach because they do not allege how the stolen data would aid identity thieves in their efforts."); *cf. Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 386 (6th Cir. 2016) (holding that plaintiffs had standing to bring data breach claims when the breached database contained personal information such as "names, dates of birth, marital statuses, genders, occupations, employers, Social Security numbers, and driver's license numbers"). Indeed, if plaintiffs have ever use their credit card to make an on-line purchase they have put themselves at risk that their information could fall into the wrong hands.

Accordingly, Plaintiffs cannot support their claim of injury by pointing to two isolated incidents of credit or debit card fraud, especially when they fail to plausibly connect those incidents to any data breach involving information controlled by Defendants. Regardless, Plaintiffs are missing a causal link in their chain of inferences as they have not shown that Defendants ever possessed the specific information required to commit the alleged credit and debit card fraud.

### 4. Plaintiffs Cannot Establish Standing Based On Alleged Harms To Their Family Members

Injury-in-fact should also be "particularized" to the plaintiff and not a "generalized grievance." *Alliance*, 602 U.S. at 381. And "[w]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009)).

Plaintiffs' claim that they are harmed because they cannot avoid having "PSI for themselves and their family members maintained in government records . . . " and that they have suffered or are at risk of suffering the compromise of their family member's PSI. Am. Compl. ¶¶ 77, 87(b), 87(e). But Plaintiffs cannot claim their family member's harm as their own for purposes of standing. The injury-in-fact test requires that "the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). Plaintiffs' alleged harms vis a vis their family members likewise fails to confer standing.

## II.     Plaintiffs' Privacy Act Claim Should Be Dismissed

As the Supreme Court has said "on many occasions [] a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text."  *FAA v. Cooper*, 566 U.S. 284, 290 (2012). "Any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *Id.* (citations omitted).  The question is not "whether Congress has consented to be sued for damages" in the abstract, but the "*scope* of that waiver," such that courts "construe any ambiguities in the scope of a waiver in favor of the sovereign."  *Id.* at 291 (emphasis in original).

Plaintiffs' Privacy Act claim should be dismissed because the relief they seek goes beyond the statute's waiver of sovereign immunity.  As discussed below, although Plaintiffs seek monetary damages and injunctive relief, Plaintiffs do not allege any actual damages resulting from the alleged Privacy Act violation, and the injunctive relief they seek is not authorized under the Privacy Act.

### A.     Plaintiffs Have Not Adequately Alleged Any "Actual Damages"

To properly state a claim for damages under the Privacy Act, Plaintiffs must plead "actual—that is, pecuniary or material—harm."  *Id.* at 296.  In *Cooper*, the Supreme Court held that the term "actual damages" in the statute is "limited to proven pecuniary or economic harm," which is a form of "special damages" that must be "specially pleaded and proved."  *Id.* at 295, 299.

The United States retains sovereign immunity under the Privacy Act for all non-economic harms, including "loss of reputation, shame, mortification, injury to the feelings and the like."  *Id.* at 295-96, 299, 304, and failure to establish "actual damages" is fatal to monetary recovery.  *Id.* at 295 (explaining that "the Privacy Act's remedial provision authorizes plaintiffs to recover . . . but only if they prove at least some 'actual damages'") (quoting 5 U.S.C. § 552a(g)(4)(A)).  Claims for damages based on emotional harm are not allowed.  *Id.* at 304 ("[T]he Privacy Act does not unequivocally authorize an award of damages for mental or emotional distress. Accordingly, the

21

Act does not waive the Federal Government's sovereign immunity from liability for such harms."); *Welborn*, 218 F. Supp. 3d at 82 (finding that "[t]he Privacy Act does not allow a claim for damages based on . . . emotional harm," and "[a]s a result, Plaintiff[ ] must specifically allege actual damages to survive a motion to dismiss for failure to state a claim.).  Further, the Court "should not assume actual damages based on a conclusory statement that Plaintiffs . . . 'have suffered or are at increased risk of suffering from' a list of potential harms." *Id.* at 82-83.  Accordingly, Plaintiffs must plead actual damages under the strictures of the Privacy Act to survive a motion to dismiss for failure to state a claim.

Applying these principles, courts in this District have routinely dismissed Privacy Act claims where concrete allegations of calculable pecuniary loss are absent. *See, e.g.*, *Stewart v. Kendall*, 578 F. Supp. 3d 18, 23-24 (D.D.C. 2022) (dismissing claim because the plaintiff failed to plausibly allege pecuniary damages caused by the alleged violation); *Bozgoz v. James*, No. 19-0239 (ABJ), 2020 WL 4732085, *11-12 (D.D.C. Aug. 14, 2020) (dismissing claim because plaintiffs alleged only general damages and "d[id] not specify any pecuniary losses they incurred"); *compare Welborn*, 218 F. Supp. 3d at 82 (dismissing claims based on alleged reputational and emotional harm and other conclusory allegations, because plaintiffs failed to "detail[] actual pecuniary or material damage" in their complaint); *with In re OPM Data Sec. Breach Litig.*, 928 F.3d at 65-66 (concluding plaintiffs had alleged "actual damages" after purchasing credit protection and/or credit repair services following a data breach, and had fraudulent accounts established and false tax returns filed in their names).

Here, Plaintiffs allege that they will be harmed through (1) the loss of opportunity to control how their data is used; (2) the compromise of their family members and their own PSI; (3) costs associated with prevention, detection, and recovery from identity theft and/or unauthorized use of various accounts; (4) lost opportunity cost from expended efforts and loss of productivity from attempting to mitigate any consequences from the alleged breach; (5) continued risk to their PSI and that of their family members; and (6) current and future costs associated with monitoring,

preventing, detecting, contesting, and repairing the impact of the allegedly compromised PSI data. Am. Compl. ¶ 87.

Yet, Plaintiffs fail to plead facts showing that they have sustained *any* calculable monetary loss as a result of the Defendants' alleged conduct. Plaintiffs state that they have suffered "damages, including actual damages within the meaning of the Privacy Act, pecuniary losses, anxiety, and emotional distress." *Id.* But *Cooper* expressly instructs there is no waiver of sovereign immunity under the Privacy Act for damages relating to mental or emotional distress. *See* 566 U.S. at 287, 295-96.

Indeed, out of all the various alleged harms, only the purported costs associated with identity theft mitigation and fraudulent charges to a credit and debit card could even plausibly be construed as actual pecuniary or material damage. But these conclusory allegations submitted by Plaintiffs are insufficient. *Id.* at 295; *see also Welborn*, 218 F. Supp. 3d at 82 (declining to assume actual damages based on conclusory statements in the plaintiffs' complaint). Accordingly, Plaintiffs fail to allege actual damages under the Privacy Act.

### 1. Purchasing Identity Theft Protect Does Not Constitute "Pecuniary Harm"

Turning first to the alleged pecuniary harm from the purchase of identity theft protection services, Plaintiffs' self-imposed mitigation costs are insufficient to be considered "actual damages" because there is no "substantial risk of future harm" to be mitigated. *Stewart*, 578 F. Supp. 3d at 24 (finding that "mitigation costs incurred to prevent future injury can qualify as actual damages and satisfy the injury-in-fact standing requirement only if there is at least a substantial risk of future harm."); *see also Clapper*, 568 U.S. at 414. Similarly here, there is no substantial risk of a future privacy breach as Plaintiffs fail to plausibly allege a public data breach or that their unauthorized credit card purchases not traceable to any action of the Defendants is "anything other than an isolated incident unlikely to reoccur." *Stewart*, 578 F. Supp. 3d at 24 (noting that beyond Plaintiffs' claim of an isolated breach increasing the likelihood of a repeat privacy breach, that

23

"Plaintiff brings no allegations about the potential threat of a repeat breach" and that the "mere fact that a breach happened in the past does not mean it is likely to happen again in the future.").

As discussed above, it is purely speculative whether the alleged access provided to DOGE team members within agencies will result in any outside disclosure of data, let alone theft of Plaintiffs' identity. Plaintiffs' hypothetical harm of having "no assurance that their PSI will receive the protection that federal law affords" along with other hypothesized future harms does not suffice. Am. Compl. ¶¶ 78-82. A "vague description of the harms allegedly sustained as a result of [an agency's] disclosure cannot support a demand for actual damages that must be 'limited to proven pecuniary or economic harm.'" *Glass v. U.S. Dep't of Just.*, 279 F. Supp. 3d 279 (D.D.C. 2017) (quoting *Cooper*, 566 U.S. at 299 (emphasis omitted)).

This is unlike the case of *Attias* where the Court found that plaintiffs plausibly alleged a substantial risk of identity theft because the breach "exposed [their] social security and credit card numbers to an intruder." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627-28 (D.C. Cir. 2017). And Plaintiffs claims are further in contrast to *In re OPM Data Sec. Breach Litig.*, 928 F.3d at 58-59, where there was an actual data breach that exposed plaintiffs' social security numbers, fingerprints, and other private information to third parties. It was on that basis the court found that mitigation costs for a substantial risk of future harm were warranted. *Id*. Plaintiffs Nemeth and Nemeth-Greenleaf *do allege*, although not credibly, that their debit and credit card information was released as a result of Defendants' actions. Putting aside the inherent flaws in these allegations, discussed *infra* Part I(A)(1)–(3), these claims were only recently pleaded in their Amended Complaint. Plaintiffs had no knowledge of any unauthorized debit or credit card activity when they purchased the identity theft monitoring services. Just as in *Clapper*, "allowing [Plaintiffs] to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of [Plaintiffs'] first failed theory of standing." 568 U.S. at 416.

In like manner, as this Court has recognized in a similar case, albeit under a different legal backdrop: "The District of Columbia Court of Appeals has expressly declined to treat heightened

risk of misuse of personal information and lost time spent on mitigation measures as actual damages for the purpose of a negligence claim in the data breach context." *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23-CV-3570 (CRC), 2024 WL 4239936, at *9 (D.D.C. Sept. 19, 2024). Like the plaintiff in that case, the instant Plaintiffs do not allege that their PSI "has been viewed nor that [their] information has been exposed in a way that would facilitate easy, imminent access." *Id*. at *12 (quoting *SAIC*, 45 F. Supp. 3d at 29). All the more that in the *Keown* case there was a data breach, whereas here there has been no proven or alleged data breach beyond conclusory and threadbare statements of the existence of one. *See generally id.*

Plaintiffs have also not credibly plead that their particular, personal information was unlawfully accessed, disclosed, or stolen. Plaintiffs alleged that they learned "about Defendants' breaches of [their] PSI from media reports," but they do not cite those media reports nor explain how they were particularized to them. Am. Compl. ¶¶ 14-18. Plaintiffs seemingly theorize that because OPM and Treasury store Plaintiffs' PSI, that DOGE's access to such information necessarily included their unique personal information. *Id.* ¶¶ 29, 31, 33, 37, 41.

These naked allegations, without more, do not suffice to connect their alleged pecuniary harm to the challenged conduct. Plaintiffs do not allege—much less establish—that USDS affiliated persons have disclosed their own personal information publicly, or that USDS itself has accessed Plaintiffs' information, let alone in any way that causes concrete harm. Unsupported legal conclusions, such as Plaintiffs' claims of an alleged breach of their unique PSI, are not to be implicitly assumed as true on its face. *See Food & Water Watch*, 808 F.3d at 913 (noting that we need not "assume the truth of legal conclusions [or] . . . accept inferences that are unsupported by the facts set out in the complaint" (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015))). The Complaint only alleges that Plaintiffs learned through media reports that their PSI had been breached. Am. Compl. ¶¶ 14-18. And that Defendant Scales was allowed to access a "massive database holding information on millions of federal employees, including Plaintiffs' PSI." *Id*. ¶

25

31.  But Plaintiffs cannot sufficiently claim that their purchase of identity theft detection services is tied to any specific disclosure of their information.

Put another way, Plaintiffs must allege "actual damages" *connected to* the adverse effect to "qualify" under the Act.  *Doe v. Chao,* 540 U.S. 614, 620-27 (2004); *Mandel v. U.S. Off. of Pers. Mgmt.,* 244 F. Supp. 2d 146, 153 (E.D.N.Y. 2003) (holding that plaintiff must establish a "causal connection" between agency violation and adverse effect).  Thus, Plaintiffs "must establish *not only* that [they were] 'adversely affected' by the improper disclosure, *but also* that [they] suffered 'some harm for which damages can reasonably be assessed.'"  *Mulhern v. Gates,* 525 F. Supp. 2d 174, 181-82 (D.D.C. 2007) (quoting *Chao,* 540 U.S. at 621).  Plaintiffs fail to make such a credible connection here.

It is speculative at best to assume that any members of USDS had read Plaintiffs' individual data.  *Reilly,* 664 F.3d at 40 (finding that it would be speculative to assume that the alleged data thief had "read, copied, or understood the data."); *see Philippeaux v. United States*, No. 10 CIV. 6143 NRB, 2011 WL 4472064, at *9 (S.D.N.Y. Sept. 27, 2011) ("[P]laintiff does not 'know[] with absolute certainty whether or not any pertinent records have been removed" and as a result his assertions were not sufficient to state a claim under the Privacy Act because he could not "adequately show that he was adversely affected by any disclosure.").  *See, e.g., Wrocklage v. DHS*, 769 F.3d 1363, 1369 (Fed. Cir. 2014) (disclosure under the Privacy Act "require[es] not just transmission, but actual viewing or imminent viewing by another"); *Luster v. Vilsack*, 667 F.3d 1089, 1098 (10th Cir. 2011) (possibility that record might be revealed does not constitute "disclosure" under the Privacy Act); *SAIC*, 45 F. Supp. 3d at 28-29; 5 C.F.R. § 297.102 ("Disclosure means providing *personal review* of a record, or a copy thereof, to someone other than the data subject or the data subject's authorized representative, parent, or legal guardian." (emphasis added)); *but see* OMB Guidelines, 40 Fed. Reg. 28948, 28953 (July 9, 1975) ("A disclosure may be either the transfer of a record or the granting of access to a record.").

### 2.  Isolated Instances Of Unauthorized Credit And Debit Card Use Does Not Constitute "Pecuniary Harm"

Next, Plaintiffs allege actual damages in the form of unauthorized charges to their credit and debit card.  Plaintiff Nemeth claims that an apparent identity thief had made two fraudulent purchases in April of 2025 using her Citi Visa credit card.  Am. Compl. ¶ 84.  Plaintiff Nemeth-Greenleaf also claims that an apparent identity thief made a fraudulent purchase in April of 2025 using her Lighthouse Union debit card.  *Id.* ¶ 85.  Plaintiff Nemeth-Greenleaf appears to reason that because Defendants had her direct deposit account information on file for depositing her salary, that the fraudster must have obtained that information from Defendants.  *Id.*  What is more, the Amended Complaint asserts in purely conclusory terms that but-for Defendants' conduct, Plaintiff Nemeth-Greenleaf's PSI "would not have been compromised and used to effectuate fraudulent, harmful injury-causing transactions, as occurred."  *Id.*

Plaintiffs are making a logical leap in assuming that the information accessed by the fraudsters was even in the possession of Defendants.  Indeed, Plaintiff Nemeth makes no such claim.  *Id.* ¶ 84.  And Plaintiff Nemeth-Greenleaf's claim cannot be squared with any common understanding of how direct deposit and credit card purchases work.  Assuming the alleged fraudster did get their hands on Plaintiff's direct deposit information, three data points provided for direct deposit—name, account number, and routing number—are insufficient to make a fraudulent credit card purchase.  Joanne Gasparini, *Get All Your Federal Benefit Payments in One Account Using Direct Payment*, Social Sec. Admin. (Sept. 3, 2020), http://perma.cc/UHR5-JZVX ("Direct deposit is the safest and most convenient way to receive your benefit payment.").  The compromised credit card may have shared the same *account* as the direct deposits, but access to one does not grant access to the other.  The criminal would have had to obtained access to her credit card number, personal identification numbers ("PINs"), card verification value code ("CVV"), expiration date, billing address, and perhaps a host of answers to security questions. Mark Kapczynski, *What can someone do with your account and routing number?*, OneRep (June 12, 2025), https://perma.cc/3BLQ-6NFT.  To be sure, the perpetrator could still commit fraudulent

acts with direct deposit information through fraudulent automated clearing house ("ACH") transfers, but this is not the same as the fraudulent credit card purchases alleged by Plaintiffs Nemeth and Nemeth-Greenleaf. Sheryl Nance-Nash, *If Someone Has Your Bank Account Number Can They Take Money Out?*, SoFi (May 19, 2025), https://perma.cc/V4AR-M37G. The fraudster had no way to make the alleged unauthorized charges with just the information provided to Defendant agencies. Thus, Plaintiffs fail to state a plausibly claim under this allegation for that reason alone.

At any rate, Plaintiffs' fraudulent charges do not constitute "actual damages" because neither Plaintiffs Nemeth nor Nemeth-Greenleaf allege that any fraudulent charges were *actually incurred* on the card or that they were in any way liable for the fraudulent charges. Indeed, Plaintiff Nemeth's credit card company offers a "zero liability" policy. https://perma.cc/9XDJ-FL2P ("Visa's Zero Liability Policy is our guarantee that [the customer] won't be held responsible for unauthorized charges made with [the customer's] account or account information"). Such information on a private website is often made judicially noticeable when the company is large, sophisticated, and highly regulated, as here with a bank like Visa. *See Liberty Mut. Ins. Co. v. Consol. Elec. & Tech. Assocs. Corp.*, No. CIVA 06-CV-10217 DT, 2007 WL 118938 at *3, n.2 (E.D. Mich. Jan. 10, 2007) (taking judicial notice of descriptive information about a firm's services on the website of a "large and sophisticated insurance company[.]"); *see also Fernandez v. Zoni Language Centers, Inc.*, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned.'" (quoting *Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002))), *aff'd*, 858 F.3d 45 (2d Cir. 2017). Thus, as Plaintiff Nemeth is not held responsible for any fraudulent charges, no financial harm has been realized from the fraudulent transaction unless she did not seek renumeration from the credit card provider. *Whalen*, 689 F. App'x at *90 (finding no particularized and concrete injury from attempted fraudulent purchases because plaintiff was never

28

asked to pay nor did pay any fraudulent charge, and that there is no future threat of fraud because the stolen credit card was promptly cancelled and no other PSI such as her birth date or Social Security number is alleged to have been stolen.).

Moving to Plaintiff Nemeth-Greenleaf's claim, debit cards receive less protection against fraud than credit cards, but still generally receive full rights for fraudulent charges if acted on within a certain period. Under the Truth in Lending Act as amended by the Fair Credit Billing Act, 15 U.S.C. § 1601 *et* seq, a person has 60 days after they receive their statement to report that their money has been fraudulently withdrawn to claim the Act's protection. Plaintiff Nemeth-Greenleaf had ample opportunity to avail herself of the debit card's fraudulent financial renumeration services. Moreover, identity theft protection service that Plaintiffs Nemeth, Nemeth-Greenleaf, and Judkins purchased provided "[e]very adult member" with $1,000,000 in insurance to "cover eligible losses and fees due to identity theft." *See* Am. Compl. ¶¶ 14, 15, 17; Aura, https://perma.cc/BFT3-R6D2.

Because Plaintiffs Nemeth and Nemeth-Greenleaf do not allege that they are in fact directly liable for the fraudulent charges, they fail to state a claim for "actual damages" under the Privacy Act. *Chao*, 540 U.S. at 620 (The Privacy Act only provides relief to "victims for 'actual damages sustained.'"); *Cooper*, 566 U.S. at 299 (explaining that actual damages are "limited to proven pecuniary or economic harm" and must be "specially pleaded and proved"). And even if Plaintiffs Nemeth and Nemeth-Greenleaf plausibly alleged that they were responsible for the fraudulent charges, they would have had a duty to mitigate any damages from the charges under the doctrine of avoidable consequences. *Edward M. Crough, Inc. v. Dep't of Gen. Servs. of D.C.*, 572 A.2d 457, 466 (D.C. 1990). (The doctrine of avoidable consequences, "bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury.").

Thus, for the aforementioned reasons, Plaintiffs fail to state a claim under the Privacy Act.

**B.    Plaintiffs Are Not Entitled To The Other Forms Of Relief They Seek**

Plaintiffs request "injunctive relief."  Am. Compl. ¶ 2.  But the Privacy Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records.  *Id.* § 552a(g)(1)(B), (g)(3)(A).  Yet Plaintiffs do not request injunctive relief under either circumstance.  Injunctive relief, as the D.C. Circuit has recognized, is not available for any other situation arising out of the Privacy Act.  *See*, *e.g.*, *Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . . ." (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *Doe v. Chao*, 435 F.3d 492, 504 (4th Cir. 2006) ("[S]ubsection (g)(1)(D) of the Privacy Act does not allow courts to grant injunctive or declaratory relief.") (collecting cases).  Accordingly, Plaintiffs are not entitled to injunctive, equitable, or declaratory relief.

## III.    Plaintiffs' FISMA Claims Should Be Dismissed

Plaintiffs claim that Defendants violated the Federal Information Security Modernization Act ("FISMA") because Defendants allegedly were required but failed to "take several steps to comply with applicable security rules and regulations."  Am. Compl. ¶ 30.  This claim also fails.

"While the D.C. Circuit has not decided the issue, it has strongly implied that FISMA gives agencies full latitude to decide how to carry out its directives."  *Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 2025 WL 1129227, at *18; *see also Cobell v. Kempthorne*, 455 F.3d 301, 314, n.5 (D.C. Cir. 2006) ("We are far from certain that courts would ever be able to review the choices an agency makes in carrying out its FISMA obligations."); *see also In re OPM Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 43-44 (D.D.C. 2017), *aff'd in part, rev'd in part and remanded*, 928 F.3d 42 (D.C. Cir. 2019) (same).  And at least one district court in this Circuit has held that there is "no private right of action under FISMA or the Modernization Act . . . ."  *Welborn*, 218 F. Supp. 3d at 81.

Assuming *arguendo* that an alleged violation of FISMA is reviewable by this Court, Plaintiffs still fail to state a claim that Defendants violate its provisions. *See generally Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 2025 WL 1129227, at *21 (finding no violation of FISMA in a similar USDS data access case). The Amended Complaint's allegations that Defendants have ignored FISMA cannot be squared with the statute's deferential standard. Indeed, Plaintiffs acknowledge that the agencies have adopted *at least some* regulations regarding information security. *See* Am. Compl. ¶¶ 29, 36. And while Plaintiffs allege that Defendants have violated said regulations, their existence still evinces that each agency has "provid[ed] information security protections" of some sort. § 3554(a)(1)(A). What is more, the Complaint alleges that leadership at both Treasury and OPM has authorized USDS personnel's systems access. Am. Compl. ¶¶ 29, 31, 37. "Even drawing reasonable inferences in Plaintiffs' favor, these allegations imply that the agency Defendants determined that whatever protections agency heads employed—even if they employed none—are what leadership deemed 'commensurate with' any risk and harm of 'unauthorized access.'" *Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 2025 WL 1129227, at *19 (quoting 44 U.S.C. § 3554(a)(1)(A)). The Court should dismiss Plaintiffs' claims of alleged FISMA violations.

## IV. The Court Should Resolve The Threshold Questions Of Standing And Failure To State A Claim Before This Matter Proceeds Any Further

Plaintiffs seek class certification for "[a]ll current, former, and prospective employees of the United States whose [PSI] was accessed without their prior written authorization from OPM and Department of Treasury beginning in January 2025." Am. Compl. ¶ 55.

Rather than undertaking class certification or any other proceedings, the Court should rule on the issues raised in the Government's motion to dismiss. It is unnecessary to undertake class certification prior to resolving this issue. Rule 23 of the Federal Rules of Civil Procedure states that "[a]t an early practicable time after a person sues . . . as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). This "early practicable time" formulation "does not indicate whether it should be made before or

after dispositive motions." William Rubenstein *et al.*, Newberg on Class Actions § 7:9 (5th ed. 2020). That treatise furthermore notes that "courts have been willing to rule on motions for summary judgment prior to class certification in circumstances in which it would facilitate efficient resolution of the case." *Id.* § 7:10 (citing cases).

Consistent with this, courts in the jurisdiction have stayed class certification pending resolution of the motion to dismiss. *See Kang v. Dep't of Homeland Sec.*, No. CV 21-2944 (RJL), 2022 WL 4446385, at *2 (D.D.C. Sept. 23, 2022); *see also Fischer v. D.C.*, No. 24-CV-00044 (CRC), 2025 WL 894445, at *3 (D.D.C. Mar. 24, 2025*); *see also Howard v. Gutierrez*, 474 F.2d 41, 44 (D.D.C. 2007). Similarly here, the Court should resolve Defendants' Motion to Dismiss before class certification as the Motion may be dispositive to the litigation.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

Dated:  August 4, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Pierce J. Anon*
PIERCE J. ANON
(N.Y. Bar No. 6184303)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*