**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DENISE NEMETH-GREENLEAF**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**, *et. al.*,<br><br>Defendants. | Case No. 25-cv-407 (CRC) |

**MEMORANDUM OPINION AND ORDER**

The Court recently denied Defendants' motion to dismiss this putative class action alleging that the Office of Personnel Management ("OPM") and Department of the Treasury violated the Privacy Act by providing the Department of Government Efficiency ("DOGE") access to personal employee data. Defendants now urge the Court to reconsider that ruling. They separately ask the Court to strike the class allegations from the complaint. The Court will deny both requests. While Defendants point out an oversight in the Court's earlier opinion, correcting that error does not alter the result. And although Plaintiffs' prospects for class certification may seem slim, Defendants have identified no threshold legal defect that would warrant the exceptional remedy of foreclosing class discovery altogether.

## I. Background

The Court has already detailed this case's factual and procedural history. See Nemeth-Greenleaf v. OPM, No. 25-cv-407 (CRC), 2026 WL 607905, *1–3 (D.D.C. Mar. 4, 2026). It recounts here only what is relevant to the present motion and what has transpired since.

In early 2025, five federal employees ("Plaintiffs") sued OPM and the Department of the Treasury (together, "Defendants" or "agencies") under the Privacy Act, seeking damages on

behalf of a putative nationwide class of "current, former, and prospective employees of the United States whose personal sensitive information ('PSI') was accessed without their prior written authorization from OPM and Department of Treasury beginning in January 2025." First Am. Class Action Compl. ("FAC") ¶¶ 89, 101. Plaintiffs alleged that the agencies gave DOGE-affiliated workers sweeping access to systems containing sensitive employee information, even though many of those workers allegedly lacked formal government-employment status, security clearances, or relevant training. See id. ¶¶ 26–42. Each plaintiff claimed to have purchased identity theft protection services as a precaution after learning about Defendants' breaches of their PSI from media reports. Id. ¶¶ 14–18. The complaint relies heavily on media reports—published between DOGE's creation and the filing of the suit—warning of both potential data mishandling and an increased risk of future unauthorized disclosures or breaches. See, e.g., id. ¶¶ 30–42, 48 & nn.3–17, 21–22.

Defendants moved to dismiss for failure to state a claim. To recover monetary damages under the Privacy Act, a plaintiff must show that (1) an agency intentionally or willfully violated the Act; and (2) "as a result" of that violation, the plaintiff suffered "actual damages," such as "reasonably incurred out-of-pocket expenses" or other economic harm. In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig., 928 F.3d 42, 62, 65 (D.C. Cir. 2019); see 5 U.S.C. § 552a(g)(1)(D), (g)(4); Chichakli v. Tillerson, 882 F.3d 229, 233 (D.C. Cir. 2018). Defendants took aim at the second element, arguing that Plaintiffs did not plead actual damages. Nemeth-Greenleaf, 2026 WL 607905, at *7.

The Court disagreed. Plaintiffs' purchase of identity theft protection services "appear[ed] reasonable" given "contemporaneous public reporting on DOGE's access to their data and its possible mishandling of data elsewhere within the government." Id. at *1. The Court reached

that conclusion after "drawing every reasonable inference" in Plaintiffs' favor—including that each plaintiff was aware of every report cited in the complaint that had been published before the plaintiff bought identity protection.[1] Id. at *8. And in light of reports and developments that followed those purchases, the Court reasoned, Plaintiffs' prophylactic "efforts to protect themselves have . . . proven only more reasonable as time has passed." Id. at *9.

Defendants have since answered, and the parties recently proposed a joint bifurcated discovery plan. The first phase would consist of class-related discovery "limited to issues necessary and relevant to addressing whether class certification is appropriate," such as "whether Plaintiffs can prove, via common evidence, the elements of their claims under the Privacy Act and whether these common questions predominate over any potential individualized issues." Joint Statement Regarding Class Disc. at 4–5. Before phase one could get underway, however, Defendants filed this present motion for reconsideration of the Court's ruling on their motion to dismiss or, in the alternative, to strike the complaint's class allegations. See Defs.' Mot. at 1–2. Plaintiffs oppose.

## II. Analysis

### A. Motion for Reconsideration

A court may reconsider any interlocutory order "as justice requires." Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004). But that phrase, broad as it sounds, is narrowly interpreted in this District. See Bernier v. Trump, 299 F. Supp. 3d 150, 156 (D.D.C. 2018). To promote predictability, finality, and preservation of judicial resources, the Court will revisit prior

[1] To be sure, precisely when each plaintiff purchased identity-protection services, and what each knew beforehand, are factual questions at the heart of this case and will likely be hotly contested. See Reply Br. at 4. At the motion-to-dismiss stage, however, the Court was required to take the well-pleaded facts in the complaint as true and draw all reasonable inferences in Plaintiffs' favor. Urquhart-Bradley v. Mobley, 964 F.3d 36, 40 n.2 (D.C. Cir. 2020).

interlocutory decisions only in "extraordinary circumstances," such as "where the initial decision was clearly erroneous and would work a manifest injustice" if left undisturbed. Kennedy v. District of Columbia, 145 F. Supp. 3d 46, 49 (D.D.C. 2015) (Cooper, J.) (quoting Shea v. Clinton, 850 F. Supp. 2d 153, 157–58 (D.D.C. 2012)). Relevant considerations include whether the Court patently misunderstood the parties, strayed far beyond the issues presented, misapprehended a material fact, or whether a significant change in controlling law had occurred in the meantime. Id. No matter the basis, however, the moving party must always show "that harm or injustice would result if reconsideration were denied." U.S. ex rel. Westrick v. Second Chance Body Armor, Inc., 893 F. Supp. 2d 258, 268 (D.D.C. 2012). So if fixing a supposed mistake "would not impact the Court's ultimate decision," reconsideration is unwarranted. White v. Hilton Hotels Ret. Plan, No. 16-cv-856 (CKK), 2019 WL 6877834, at *4 (D.D.C. Dec. 17, 2019). And reconsideration will be denied if a party merely recycles arguments already rejected on the merits or raises new ones it could have made earlier. Fogg v. Bondi, No. 24-cv-0792 (CRC), 2025 WL 2267811, at *2 (D.D.C. Aug. 8, 2025) (collecting cases).

Defendants argue that reconsideration of the order denying their motion to dismiss is warranted because the Court misunderstood a relevant fact about the sequence of events. Specifically, the Court's motion-to-dismiss opinion reasoned that Plaintiffs' decision to purchase identity theft protection services was reasonable in light of, among many other things, a whistleblower report concerning Russia-based users who allegedly used DOGE-related login credentials to exfiltrate employee data from NLRB systems. See Nemeth-Greenleaf, 2026 WL 607905, at *2, *8. But as Defendants point out, that report did not become public until April 2025—two months after Plaintiffs filed their initial complaint. See FAC ¶ 49 n.23. Plaintiffs therefore could not have relied on it when deciding to purchase identity-theft protection. And

without the whistleblower report, Defendants contend, Plaintiffs have not alleged enough to show that their decision to purchase those services was reasonable based on what they knew at the time. See Defs.' Mot. at 3–7.

Defendants are correct about the chronology. The whistleblower report postdated the initial complaint and thus could not have factored into Plaintiffs' decision. See Initial Compl. ¶¶ 19–23 (alleging that Plaintiffs had purchased identity theft protection services by February 11, 2025). But subtracting the whistleblower report from the equation does not change the answer. Based on the other allegations in the amended complaint—including reports from reputable sources that predated the filing of the initial complaint—it was reasonable for Plaintiffs to take prophylactic steps to protect their identity.

As the Court previously explained, Plaintiffs alleged that Defendants shared their personal information with DOGE staffers who, at the relevant time, were not government employees, had not completed the necessary training, and had demonstrated a willingness to handle and share sensitive data in an insecure manner. See Nemeth-Greenleaf, 2026 WL 607905, at *8. Some of those staffers also had remarkably little work experience, and what experience they did have was largely at Elon Musk's private companies—circumstances that reasonably raised questions about whether they could be entrusted with the security of highly sensitive government data. Id. One staffer with allegedly "unfettered" access to PSI maintained by OPM, for example, had graduated from high school in 2022, had previously worked at Neuralink only as an intern, and went by the nickname of "Bigballs" on LinkedIn. FAC ¶¶ 33–34. Experts described giving such nonemployees without proper training or clearances broad access to sensitive data as "madness." Id. ¶ 36 (quoting Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They Are Terrified*, THE ATLANTIC (Feb. 7, 2025)).

Plaintiffs also pleaded "that they were aware of contemporaneous public expert reports about how changes in agency security protocols generally could lead to increased risk of improper data exfiltration." Nemeth-Greenleaf, 2026 WL 607905, at *8. Importantly, that danger was not limited to improper handling by DOGE personnel themselves. Plaintiffs were also allegedly aware of a meaningful risk of a further—and potentially more damaging—disclosure to foreign adversaries. OPM, according to the complaint, is no stranger to foreign cyberattacks. In 2015, for instance, hackers allegedly working on behalf of the Chinese government carried out a large-scale attack on OPM, siphoning sensitive information belonging to millions of federal workers. FAC ¶ 47. Against that backdrop, experts warned "that Russia, China, Iran, and other adversaries could seek to exploit the chaos by launching new cyber intrusions or targeting the devices and communications of Musk's [DOGE] team." Id. ¶ 48 (quoting Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials*, WASH. POST (Feb. 6, 2025)). One expert put the concern more vividly: "If I were a nation like China, Russia, or Iran, I'd be having a field day with a bunch of college kids running around with sensitive federal government data on unencrypted hard drives." Id.

A federal employee who knew all that did not have to wait for an actual breach before taking reasonable precautions to guard against potential fraud. Nothing about the timing of the later whistleblower report undermines that conclusion. If anything, the whistleblower report merely confirmed the risk that experts had already identified—foreign adversaries might exploit weakened security practices to obtain sensitive employee data. See Nemeth-Greenleaf, 2026 WL 607905, at *9 (discussing how events post-dating the filing of the case demonstrate that Plaintiffs' "efforts to protect themselves have . . . proven only more reasonable as time has

passed"). The Court's conclusion therefore remains unchanged: Plaintiffs have plausibly alleged that purchasing identity theft protection services was a reasonable response to the risks known to them at the time. With that established, Defendants' arguments for reconsideration have "already [been] rejected on the merits." Fogg, 2025 WL 2267811, at *2 (quoting BEG Invs., LLC v. Alberti, 85 F. Supp. 3d 54, 58 (D.D.C. 2015)). The Court will thus deny their motion for reconsideration.

B. Motion to Strike Class Allegations

Defendants alternatively move to strike the complaint's class allegations. That motion has more force, as Defendants persuasively argue that Plaintiffs may encounter substantial difficulty in satisfying the requirements for class certification. But that is a fight for another day. Striking class allegations before class discovery begins is strong medicine, reserved for cases in which the proposed class has a seemingly incurable legal infirmity. Defendants have not identified one here. The Court therefore denies the motion to strike, without prejudice to Defendants renewing their arguments later.

In this Court, defendants "may move at any time to strike . . . class action allegations." LCvR 23.1(b). But motions to strike "are a drastic remedy, which courts generally disfavor." Naegele v. Albers, 355 F. Supp. 2d 129, 142 (D.D.C. 2005). Pre-discovery motions to strike class allegations are "even more disfavored." Chen-Oster v. Goldman, Sachs & Co., 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (citation omitted). That is so because "striking class allegations is functionally equivalent to an order denying class certification," Microsoft Corp. v. Baker, 582 U.S. 23, 34 n.7 (2017) (cleaned up), and plaintiffs who state a potentially viable class claim are almost always entitled to some class-related discovery before the question of class certification is resolved, see Burton v. District of Columbia, 277 F.R.D. 224, 230 (D.D.C. 2011).

Accordingly, "courts rarely grant motions to . . . strike class allegations before there is a chance for discovery" or a motion to certify has been filed. Smith v. Wash. Post Co., 962 F. Supp. 2d 79, 90 (D.D.C. 2013); In re McCormick & Co., Inc., 217 F. Supp. 3d 124, 140 (D.D.C. 2016) (same); cf. Artis v. Yellen, 309 F.R.D. 69, 73 (D.D.C. 2015) (granting motion to strike "[a]fter an exhaustive period of class discovery").

But there is a narrow exception to that general rule: Courts may strike class allegations before discovery when a legal defect is apparent from the face of the complaint and no factual development could fix it. See Oliver v. Navy Fed. Credit Union, 167 F.4th 106, 110, 112–13 (4th Cir. 2026) (holding that class allegations may be struck at the pleading stage only if the proposed class fails as a "matter of law"); Elson v. Black, 56 F.4th 1002, 1006 (5th Cir. 2023) (explaining that courts may strike class allegations "before discovery is complete when it is apparent from the complaint that a class action cannot be maintained"). Examples include where the court lacks jurisdiction over class claims, see, e.g., Woodard v. FedEx Freight E., Inc., 250 F.R.D. 178, 182–83 (M.D. Pa. 2008), where the named plaintiff is necessarily atypical of the proposed class, see, e.g., Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n, 149 F. Supp. 3d 1, 10–11 (D.D.C. 2015), or when choice-of-law rules splinter a class and defeat predominance, see, e.g., Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 945–49 (6th Cir. 2011). In such cases where the proposed class is doomed from the outset, striking class allegations is prudent to spare the parties from unnecessary and burdensome class discovery. See Ross v. Lockheed Martin Corp., No. 16-cv-2508 (KBJ), 2020 WL 4192566, at *2 (D.D.C. July 21, 2020).

In contrast, "[i]f the viability of a class depends on factual matters that must be developed through discovery," as is most often the case, "a motion to strike will be denied pending the full-blown certification motion." 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:4 &

n.31 (22d ed. 2025) (collecting cases). So when the defendant's objections depend on indeterminate facts bearing on the Rule 23 factors—commonality, typicality, predominance, ascertainability, or manageability—courts routinely and overwhelmingly deny pre-discovery motions to strike class allegations and leave those fact-specific arguments for the class-certification stage. See, e.g., Mey v. Levin, No. 23-cv-46-JPB, 2023 WL 12089839, at *3 (N.D.W. Va. Sept. 15, 2023) (collecting cases); Winfield v. Citibank, N.A., 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) (same). That remains true even when plaintiffs face long odds of ultimately certifying the class. See, e.g., Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co., 520 F. Supp. 3d 1258, 1273 (C.D. Cal. 2021) ("While there may indeed be substantial hurdles to class certification in this case, the Court declines to strike the class allegations at this juncture."); Smith, 962 F. Supp. 2d at 91 ("Even if the Court is somewhat skeptical that the facts will show that class resolution is appropriate in this case, it should not prematurely decide the class certification issue." (cleaned up)). In short, unless class certification appears legally impossible from the face of the complaint, pre-discovery motions to strike should be denied as premature.

The thrust of Defendants' motion to strike is that Plaintiffs face a Sisyphean task in satisfying Rule 23's predominance requirement because individualized questions will overwhelm any issues common to the class. See Defs.' Mot. at 8–11. This argument is well taken. A class cannot be certified if individual inquiries dwarf common ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997)). And past cases have declined to certify Privacy Act damages classes for this precise reason. See, e.g., Schmidt v. U.S. Dep't of Veterans Affs., 218 F.R.D. 619, 637–38 (E.D. Wis. 2003); Lyon v. United States, 94 F.R.D. 69, 76 (W.D. Okla.

1982) ("In Privacy Act damages actions, questions affecting only individual members greatly outweigh questions of law and fact common to the class.").

Defendants emphasize a host of predominance-related obstacles that may derail Plaintiffs' path to certification. Three stand out. *First*, Plaintiffs want to certify a broad class. See Defs.' Mot. 10. But their proposed class of essentially "[a]ll current, former, and prospective employees of the United States," FAC ¶ 89, would likely "yield a high number of 'false positives'"—i.e., federal employees "who have spent no time on mitigation—and would thus require 'individualized proof of injury,'" Attias v. CareFirst, Inc., 344 F.R.D. 38, 53 (D.D.C. 2023) (Cooper, J.) (quoting In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244, 253 (D.C. Cir. 2013)). *Second*, it is far from obvious that any classwide source of proof exists "that could readily show which potential class members undertook mitigation measures at all, and specifically which potential class members acted in response to" the alleged Privacy Act violations, "as opposed to any number of other data breaches in recent years" that may have prompted a particular federal employee to purchase identity-protection services. Id. *Third*, even if the class could be reliably circumscribed to employees who incurred out-of-pocket expenses to protect themselves from the downstream effects of DOGE's data handling, a plaintiff is entitled to damages under the Privacy Act only if that prophylactic decision was reasonable. Nemeth-Greenleaf, 2026 WL 607905, at *8. But as Defendants explain and the motion-to-dismiss opinion demonstrates, gauging reasonableness entails a "highly fact-specific inquir[y] into what each plaintiff knew, when they knew it, and what action they took in response." Defs.' Mot. at 9.

That said, the factual nature of Defendants' arguments for striking the class allegations underscore why the motion is premature. See Winfield, 842 F. Supp. 2d at 573 ("[A] determination of whether the Rule 23 requirements are met is more properly deferred to the class

certification stage, where a more complete factual record can aid the court in making this determination."). Notably, Defendants almost exclusively cite opinions involving class-certification motions. See Defs.' Mot. at 8–11. Because this is a pre-discovery motion to strike, the standard for giving Defendants the relief they request is more stringent: Do the pleadings show that class discovery would be futile due to insurmountable legal hurdles? Defendants' arguments fall short of clearing that high bar.

For starters, this Court "is not bound by the class definition proposed in the complaint" and should not strike the class allegations "simply because the complaint seeks to define the class too broadly." Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993). Holding Plaintiffs to the plain language of their pleadings-stage proposal "would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition." In re Monumental Life Ins. Co., 365 F.3d 408, 414 (5th Cir. 2004). Plaintiffs may, after class discovery, propose a more narrowly defined class. See Ross, 2020 WL 4192566, at *2 (explaining that class discovery allows "plaintiffs to flesh out the contours of their proposed class action for certification purposes," meaning that "the exact shape and form" of the class will likely "evolve[]" (internal quotation marks and citation omitted)). This Court, too, retains discretion to refine the class definition further—including by creating subclasses—should the circumstances warrant. See Wagner v. Taylor, 836 F.2d 578, 589–90 (D.C. Cir. 1987).

Nor is it entirely "clear, at this point, that individualized proof of injury or damages will [necessarily] overwhelm common issues." Smith, 962 F. Supp. 2d at 91. After all, "the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984). Class discovery, moreover, will shed light on whether accurate "methods by which

to measure class-wide damages" exist. Joint Statement Regarding Class Disc. at 5. And any difficulties in resolving the actual-damages element on a classwide basis might be avoided by limiting certification to the violation element of Plaintiffs' Privacy Act claims or to another discrete issue susceptible to common resolution. See Harris v. Med. Transp. Mgmt., 77 F.4th 746, 760–61 (D.C. Cir. 2023) ("Rule 23(c)(4) may be used to certify an issue that is less than an entire cause of action."); Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). Accordingly, although "Plaintiffs will likely face an uphill battle at class certification," the Court concludes that "it would be premature to strike the class allegations before plaintiffs have had an opportunity to develop the factual record and crystallize those common questions susceptible to common answers." Gilbert v. Lands End, Inc., No. 19-cv-1066-JDP, 2020 WL 1912003, at *5 (W.D. Wis. Apr. 20, 2020).

Finally, Defendants seem to suggest that the class allegations should be struck because Plaintiffs have proposed an impermissible "fail-safe" class—that is, a class defined in a circular way that precludes membership unless the liability of the defendant is established. Defs.' Mot. at 11. To illustrate, "a class defined as 'those shareholders whom Company X defrauded' would be fail safe" because "[i]f the named plaintiffs prevail on the merits by showing fraud, then the class is populated by all those with meritorious claims; if the named plaintiffs fail to prove fraud, there will be no class members to be bound by the adverse judgment." In re White, 64 F.4th 302, 303 (D.C. Cir. 2023). But the Court need not yet opine on whether the class proposed in the complaint is "fail safe" because the remedy for a fail-safe class in this Circuit is not, as

Defendants suggest, to strike class allegations.[2] Instead, the proper "solution . . . is for the district court either to work with counsel to eliminate the problem or for the district court to simply define the class itself" at the class-certification stage, after it has marched through Rule 23's requirements. Id. at 311–15; see, e.g., Andres v. Town of Wheatfield, 621 F. Supp. 3d 415, 418–19 (W.D.N.Y 2022) (denying motion to strike class allegations based on purported fail-safe class definition as premature). So whatever fail-safe concerns Defendants may have will be dealt with once the class definition has matured at the certification stage.

## III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' [41] Motion for Reconsideration of the Order Denying Their Motion to Dismiss is DENIED and their Alternative Motion to Strike the Class Allegations is DENIED without prejudice.

**ORDERED** that the parties shall propose, by September 4, 2026, an updated joint discovery plan in light of this opinion.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 28, 2026

[2] To be sure, some courts have concluded that a proposed fail-safe class is one of the "rare few" instances where a pre-discovery motion to strike class allegations may be granted. Friel v. Line 5, LLC, No. 24-cv-1866-JKM, 2025 WL 2422617, at *4 (M.D. Pa. Aug. 21, 2025); see In re Google Generative AI Copyright Litig., No. 23-cv-03440-EKL, 2025 WL 1159998, at *3 (N.D. Cal. Apr. 21, 2025). But that is not the law in this Circuit.